Filed 3/4/16  In re Mason C. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re Mason C., a Person Coming Under the Juvenile Court Law. | |
| TUOLUMNE COUNTY DEPARTMENT OF SOCIAL SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> SARA S. et al., <br><br> Defendants and Appellants. | F071810 <br><br> (Tuolumne Super. Ct. No. JV7465) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tuolumne County.  Donald I. Segerstrom, Jr., Judge.

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant, Sara S.

Catherine C. Czar, under appointment by the Court of Appeal, for Defendant and Appellant, Kevin C.

Sarah Carrillo, County Counsel, for Plaintiff and Respondent.

-ooOoo-

Mason C.'s father, appellant Kevin C. ("Father"), contends the trial court erred in setting adoption as the permanent plan for his son. Specifically, he submits the court should have selected long-term guardianship without termination of parental rights because he "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."[1]  (Welf. & Inst., § 366.26, subd. (c)(1)(B)(i).)[2] The trial court rejected that contention, and we affirm.

## FACTS

### Prior Dependency Case

In 2012, the Tuolumne County Child Welfare Services ("CWS") received a report that Mother and Father had been pulled over with 0.2 grams of methamphetamine and a pipe. Father was arrested on a drug charge and Mother was arrested for child endangerment. Mason C., who was 2 weeks old, was detained.

Both parents were ordered to complete a dependency drug court family reunification case plan. The family eventually reunified, and the dependency case was terminated without prejudice.

### April 3, 2014, Petition

On April 3, 2014, the Tuolumne County Department of Social Services (the "Department") filed a section 300 petition concerning Mason C., who was then 2 years old. The petition and supporting papers alleged the following.

On March 1, 2013, Mother was arrested on a domestic violence charge for throwing an axe at Father. Mother was also arrested on June 15, 2013, for driving under the influence, possessing a controlled substance and endangering a child.

---

[1] Appellant Sara S. ("Mother") joins Father's argument.

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

On February 24, 2014, CWS was told that Mother had reported to the sheriff's department that Father had hit her, causing a "black eye." Mason was present when the incident occurred. Mother and Father later denied that Mason was present during their domestic violence issues.

Mother admitted using methamphetamine on March 1, 2014, and her hair follicle sample submitted on March 27, 2014, tested positive for methamphetamine and marijuana. Mother "admitted she was not able to provide care to Mason because she 'has to get her head right.' " Mother said she believed the best place for Mason C. was with his former foster parent. Mother was concerned Father would take Mason C. and leave the state.

On March 10, 2014, Father "admitted that domestic violence had occurred between him and [Mother] while Mason was present." On March 27, 2014, Father failed to submit a hair follicle sample for court-ordered drug screening.

**Detention Orders**

After a contested detention hearing on April 23, 2014, the court found the allegations of the petitions true and ordered Mason C. detained.

**Jurisdictional Orders**

After a contested jurisdiction hearing, the court found the allegations of the petition true, except the allegations concerning Father's drug use. The court found that Mason came within the provisions of section 300 and placed him in the care of the Department pending a contested disposition hearing.

**Amended Dependency Petition**

On May 28, 2014, the Department filed an amended dependency petition.

The amended petition added several allegations, including that on February 9, 2014, Father punched Mother, knocking her to the ground and causing a black eye. On March 1, 2013, Mother threw a "2-bladed axe" in Father's direction, causing him injury. Mother was arrested and charged with inflicting corporal injury on a spouse or

cohabitant. (Pen. Code, § 273.5.) On March 10, 2014, Father admitted that "domestic violence had occurred between him" and Mother while Mason C. was present. Mother admitted that Mason C. was taken to the home of a previous foster parent "due to concerns about the child being present while there was ongoing domestic violence."

**Dispositional Orders**

On August 1, 2014, the court found that Mason came within section 300, subdivision (b) and adjudged him a dependent of the court. The court ordered that Mason remain in the physical custody of the Department. The court denied reunification services to Mother. The court granted Mother one supervised visit per month, and granted Father two supervised visits per week.

**The Department's Request to Have Father Complete Drug Court Program**

On August 11, 2014, the Department filed a request to change a court order. (§ 388.) The Department prepared a "[§] 388 Report" dated August 12, 2014. The report recounted that on July 7, 2014, Father came to the CWS office and requested to speak to supervisor Florencia Baldwin. Father told Baldwin that he had relapsed on July 4, 2014. He drank beer which "eventually led to him using methamphetamine." Father then submitted to drug testing which yielded positive results for amphetamines, methamphetamines, and ethyl glucuronide (EtG). The Department requested that Father sign and comply with an updated "Dependency Drug Court Family Reunification case plan."

On August 21, 2014, the court granted the Department's section 388 request and ordered father to sign and comply with the Department's drug court case plan.

**Six-Month Review Orders**

On January 28, 2015, after the six-month review hearing, the court terminated Father's reunification services and scheduled a section 366.26 hearing.

The court held a contested section 366.26 hearing on May 22, 2015.[3] Father argued the court should choose long-term guardianship, rather than adoption, as the plan for Mason. He argued that the court should refuse to terminate Father's parental rights because he "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

**Father's Visitation History**

On August 1, 2014, the court granted Father two visits per week for a total of two hours per week. On August 25, 2014, Father cancelled his visit with Mason because he "had too much going on." Father also cancelled his visits on September 29, 2014, November 10, 2014, December 10, 2014, and December 15, 2015, and left a visit early on October 15, 2014. According to Mason's foster parents: "[W]hen visitation is cancelled, Mason has difficulty managing anxiety and anger, and will often tantrum."

During a visit on September 22, 2014, Father "brought Hostess cakes for Mason as a snack." Mason became energetic and Father told him, "I will whoop your ass." Father said that if Mason bit him, he would "spank his little ass." A couple minutes later, Father said that he had never actually spanked Mason.

During a visit on October 22, 2014, Father did not change Mason's diaper even though it had smelled for at least 45 minutes. He finally changed the diaper after a community health worker told him to, but by that time Mason's diaper had leaked through to his jeans. Father did not have a change of clothes for Mason.

During a visit on December 17, 2014, Father was "frequently on his cell phone throughout the visit," and had Mason watch a cartoon for the last 20 minutes of the visit.

However, the "majority" of the visits Father did attend were "appropriate."

---

[3] Mother was not present at the hearing. Her counsel moved for a continuance, which the court denied.

5.

By the time of the section 366.26 hearing in May 2015, Mason was visiting with Father once per month for two hours. The visits were supervised at the CWS office. Father would bring snacks for Mason and "interact appropriately" with him during visits. The two would watch videos on Father's phone, play with toy trains, color and read books.

**Father's Testimony at the Section 366.26 Hearing**

Father conceded at the section 366.26 hearing that Mason was adoptable. However, he believed the plan for Mason should be a long-term placement with his current caretakers without a termination of his parental rights. Father said it was in Mason's best interests to stay with his current caretakers "until at least he was five." Father proposed a long-term guardianship for "an unspecified amount of time, but continue to allow me to see my son and be part of his life …."

Father testified that he "believed" he had missed two visits with Mason in a year and one-half. Father testified that Mason, who was approximately three and one-half at the time of the hearing, had been placed with him for a total of "[a] year, a year and a half" of his life. Father's counsel asked him to describe his parental role, to which Father replied, "I'm his daddy. When he comes in the room, he says, daddy, and he comes and he hugs me. I mean, what more do I have to tell you?"

**Trial Court's Ruling**

The court issued a written order on June 2, 2015. After noting that Father conceded Mason's adoptability, the court analyzed whether Father had carried his burden in establishing the beneficial relationship exception to adoption.

The court observed that a social worker's report indicated that "there have been several concerns during visitation and multiple cancellations from [Father]." The court concluded that "[i]n relation to his life of three years, Mason has spent relatively little time in unsupervised contact with [Father] …."

The court also found that "[o]nce [Father] regained custody of Mason after the first dependency proceeding, [Father's] life was characterized by instability and dysfunction surrounding his relationship with [Mother.]" Father "relapsed shortly after being offered services a second time." In contrast, "Mason has remained in a secure [foster] placement for the majority of his life and is bonded with his current and prospective caregivers. In short, [Father] has failed to show that the beneficial-relationship exception applies in this case."

The court terminated Mother and Father's parental rights. Mother and Father now appeal.

## DISCUSSION

**I.     THE TRIAL COURT DID NOT ERR IN CONCLUDING FATHER FAILED TO PROVE THE BENEFICIAL RELATIONSHIP EXCEPTION TO ADOPTION APPLIES**

A. <u>Law</u>

"At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship or long-term foster care. [Citation.] If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans. [Citations.] [¶] Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1). [Citations.] Section 366.26, subdivision (c)(1)(B)(i), provides an exception to termination of parental rights when '[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' " (*In re S.B.* (2008) 164 Cal.App.4th 289, 296–297.)

Father conceded below that Mason was adoptable. The issue in this appeal is whether Father carried his burden "to show that termination of parental rights would be detrimental to the child under" (*In re S.B.*, *supra*, 164 Cal.App.4th at p. 297) the

7.

beneficial relationship exception. (See § 366.26, subd. (c)(1)(B)(i).) The trial court concluded that he did not carry his burden and we review that determination for substantial evidence. (*In re S.B.*, *supra*, at pp. 297–298.)

"We determine whether there is substantial evidence to support the trial court's ruling by reviewing the evidence most favorably to the prevailing party and indulging in all legitimate and reasonable inferences to uphold the court's ruling. [Citation.] If the court's ruling is supported by substantial evidence, the reviewing court must affirm the court's rejection of the exceptions to termination of parental rights under section 366.26, subdivision (c). [Citation.]" (*In re S.B.*, *supra*, 164 Cal.App.4th at pp. 297–298.)

B. Analysis

*1.) Substantial Evidence Supports the Trial Court's Conclusion*

To merely describe Father's visitation history is to conclude that the trial court's decision survives substantial evidence review. Father claims he "established that he had maintained regular and consistent visitation, to the extent permitted by court orders." The record supplies substantial evidence to support a contrary conclusion. Father cancelled or failed to attend visits on April 10, June 9, June 11, June 23, June 16, June 18, June 23, 2014, August 25, September 29, November 10, December 10, and December 15, 2014, and on January 12, 2015. These cancellations affected Mason negatively. According to his foster parents, Mason responded to cancelled visits with tantrums, and difficulty managing anxiety and anger. One of his foster parents reported that "Mason gets very angry and then very sad and attached to me when his parents miss visits. He holds on to me and says don't leave me."

To be sure, there was evidence that Father did not miss all of his visits and that many of the visits he attended went well. Father testified that Mason was happy to see him and called him "daddy." But Father's burden is higher than that. A parent does not successfully invoke the beneficial relationship exception by merely producing evidence that the child has received some benefit from his or her relationship with the parent.

8.

"Interaction between natural parent and child will [often] confer some incidental benefit to the child."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)  But a *beneficial* relationship, as that term is used in the case law, means a relationship that "promotes the well-being of the child *to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.*"  (*Ibid.*, italics added.)  Father simply failed to establish that such a relationship exists between him and Mason.

### 2.) The Record Does not Indicate Mason's Caretakers Were Amenable to a Long-Term Guardianship Arrangement

Father also argues that evidence established that Mason's current caretakers were willing to be legal guardians.  However, the testimony he cites does not support this contention.  The following exchange occurred between Father and the court at the section 366.26 hearing:

> "THE COURT: What if these foster parents don't want to be guardians and Mason goes into foster care with somebody you don't know?
>
> "[FATHER]: That wouldn't happen.
>
> "THE COURT: How do you know?
>
> "[FATHER]: Because I know these people.
>
> "[FATHER][4]: They've already said that, you know, they want to keep me in his life.  Even they said that it would be in his best interest.
>
> "THE COURT: All right.  But did they say to you that they wanted to not adopt Mason, but have him in guardianship?
>
> "[FATHER]: No, they didn't say that to me."

---

**4** The reporter's transcript attributes this statement to the court.  However, the context strongly suggests this was a typographical error and that the statement was in fact made by Father.

9.

This exchange does not support Father's claim that there was substantial evidence Mason's caretakers were willing to become Mason's guardians (rather than his adoptive parents).[5]

## II. OUR REJECTION OF FATHER'S ARGUMENT ON APPEAL NECESSITATES REJECTION OF MOTHER'S APPEAL ON THE MERITS

Mother does not advance any independent arguments on appeal, but instead joins in Father's brief. For the reasons set forth above, we have rejected those arguments.

### DISPOSITION

The order is affirmed.

_____
POOCHIGIAN, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
KANE, J.

---

[5] In his reply brief, Father maintains his testimony established that the caretakers "were also willing to do another permanent plan such as guardianship." Again, we disagree. But more fundamentally, the court was obligated to terminate parental rights unless an exception applied. (§ 366.26, subd. (c)(1) ["the court *shall* terminate parental rights unless either of the following applies …" (italics added)].) Here the court determined that Father failed to establish the beneficial relationship exception, and we affirm that conclusion. As a result, whether or not the caretakers would have accepted a guardianship is not dispositive.

10.